UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSHUA JAMES KINDER and                         **REPORT, RECOMMENDATION**
SHANE MICHAEL GOGEL,                            **AND ORDER**

                           Plaintiffs,            10-CV-00248-RJA-JJM

v.

CITY OF SALAMANCA,
CITY OF SALAMANCA POLICE DEPARTMENT,
and SGT. RHONDA STANTON,

                         Defendants.
_____

       This case has been referred to me by Hon. Richard J. Arcara for supervision of

pretrial proceedings [5].[1]  Before me are defendants' motion for summary judgment [16] and

plaintiffs' cross-motion for leave to amend the Complaint [26].  For the following reasons, I

order that plaintiffs' motion for leave to amend be granted, and I recommend that defendants'

motion for summary judgment be granted in part and denied in part.


## BACKGROUND

       Plaintiffs seek to recover damages for their alleged false arrest and malicious

prosecution arising from criminal charges brought against them for the alleged rape of Brittany

Miller on December 9, 2008.

### The Incident

       At approximately 5:30 p.m. on December 9, 2008, Brittany Miller and her friend

Bailey Redeye arrived at an apartment at 310 Hillview Homes in Salamanca, New York.  Ehman

_____

[1]     Bracketed references are to CM-ECF docket entries.

Affidavit [16], Ex. E, p.24, Ex. F, p.22.  Miller and the plaintiffs were each 17 years old at the

time.  Id., Ex. U-3, pp.1-2.  After being at the apartment for approximately one hour, Miller and

Redeye left the apartment in Miller's vehicle to obtain beer.  Id., Ex. E, p.29; Elbadawi Affidavit

[26-1], Ex. 2, p.11.  They drove to the home of Miller's sister, Ashley Weir, where they smoked

marijuana with Dylan Weir, her sister's husband, at approximately 6:30 p.m. Ehman Affidavit

[16], Ex. G, pp.44-45, Ex. P, pp.19-20.  Ashley Weir was not present at that time.  Elbadawi

Affidavit [26-1], Ex. 2, p.12. Miller and Redeye eventually returned to plaintiffs' apartment with

a 30-pack of beer.  Id., Ex. 2, p.14; Ehman Affidavit [16], Ex. G, p.38.

     Miller, Redeye and plaintiffs then began drinking beer and playing drinking

games.  Defendants' Statement of Undisputed Facts [18], ¶7.  Miller stated that she drank five or

six beers.  Ehman Affidavit [16], Ex. G, p.40.  Her last recollection of being in the apartment was

going to the upstairs bathroom.  Defendants' Statement of Undisputed Facts [18], ¶8.  Both

plaintiffs concede that they had sexual intercourse with Miller that evening, but claim that it was

consensual.  Id., ¶¶5, 6

     Ashley Weir arrived at the apartment at approximately 10:30 p.m. that evening

and located Miller in an upstairs bedroom, unconscious with vomit around her head.  Ehman

Affidavit [16], Ex. O, pp.30-31.  Miller was covered with a blanket, but was not wearing pants,

and her underwear was around her ankles.  Id., p.32.  Dylan Weir and his friend Nathan Moore

carried Miller down the stairs.  Id., p.34.  They took her to their car and called 911.  Id., pp.35-36.

An ambulance responded and transported Miller to the Olean General Hospital.  Id., pp.36-37.

### The Investigation

Salamanca Police Officers Joseph Frentz and Gregg Stagg and Lieutenant James Schultz responded to the apartment. Ehman Affidavit [16], Ex. U-3, p.4. Upon arrival, Officer Frentz spoke with Ashley Weir and observed that Miller was "semi conscous [*sic*]". Id.[2] "After talking with the suspects, from their side of the story, it appeared [to him that] everything was consensual." Id., Ex. L. p.10, Ex. U-3, p.4. Two other individuals (Brent Moritz and Michael Frary) were present in the apartment at the time the police arrived, but were not asked about their observations of Miller. Elbadawi Affidavit [26-1], Ex.5, p.10, Ex. 6, pp.35-36.

At approximately 3:30 a.m., Officer Frentz learned from dispatch that Miller was stating that she had been raped. He went to the hospital, where he took statements from Miller and Ashley Weir. Ehman Affidavit [16], Ex. U-3, p.4. Officer Frentz also took Miller's clothes and rape kit into evidence and spoke to a nurse who "stated that there was some injuries that were . . . concurrent with some kind of violent act that occurred", before turning the investigation over to Investigator Ronda Stanton. Id., Ex. L. p.12, Ex. S, pp.80-82, Ex. U-4, p.4.[3] Officer Frentz spoke with Sgt. Stanton by telephone during the course of the evening. Id., Ex. L, pp.10-11, 13-14.

According to Miller's sworn statement obtained by Officer Frentz, she did not recall anything until waking up in the ambulance, but that she "did not give any consent to have intercourse with anyone there". Id., Ex. U-6. In her sworn statement to Officer Frentz, Ashley

---

[2] Whereas Officer Frentz's narrative statement in the Incident Report states that Miller was "semi conscous [*sic*]" in the front seat of the car (Ehman affidavit [16], Ex. U-3, p.4), at his deposition he testified that she was "unconscious" in the front seat of the car. Id., Ex. L, pp.23, 25.

[3] Rhonda Stanton is now known as Ronda Bush. Ehman Affidavit [16], Ex. K, p.7.

Weir described the events that led her to call to 911, mentioning that she "tried asking [Miller] what happened.  She said she didnt [*sic*] know and started crying.  I asked her if she wanted to go to the hospital she said yes. . . .  She was throwing up all over herself in the car, she kept passing out.  She couldnt [*sic*] barely talk she had no clue".  Id., Ex. U-7.

Officer Stagg arrived at the apartment and spoke to Kinder and Redeye.  Ehman Affidavit [16], Ex. M, pp.11-13.  From these conversations, he had no reason to believe that a sexual assault occurred.  Id., pp.12-13.  He never spoke to Sgt. Stanton about the investigation. Id., p.13.

Lieutenant Schultz arrived at the scene and spoke with Miller (who was by then in an ambulance). Ehman Affidavit [16], Ex. N, p.13.  Although she appeared intoxicated, she answered his pedigree questions.  Id., p. 13.  When he asked her whether she had casual sex with plaintiff  Gogel,  she responded, "I probably did".  Ehman Affidavit [16], Ex. N, pp.13-14, Ex. U-3, p.3. The incident report reflects that Lieutenant Schultz was  informed by Officer Frentz that Ashley Weir "talked to her sister and she stated that she had consented to having sex".  Id., Ex. U-3, p.3.[4]

No one present at the apartment, including Ashley Weir, told Lieutenant Schultz that a sexual assault occurred.  Id., Ex. N, p.19.  Thus, while the beer and marijuana paraphernalia located in the apartment were confiscated, no charges were made that evening.  Id., Ex.N, p.21.

---

[4]	Officer Frentz testified that this was not what Ashley Weir told him.  Ehman Affidavit [16], Ex. L, pp.22-23.

Sgt. Stanton reported to work early on the morning of December 10, 2008. Id., Ex. K, p.53.  At that time, she was "informed by Officer Frentz that the nurse at the hospital said that . . . it matched a sexual assault . . . .  I also met with [Miller] at the PD and saw her bruising.  She was in no state for an interview at the time.  I also read the 710.30s from the officers. . . .  The BAC [blood alcohol content] was a big issue.  She was a 23 at the hospital.  I was also told by . . . [Officer Frentz] that she would have been incapacitated at that level.  And also that she was not awake until early that next morning to consent to a sexual assault kit."  Id., Ex. K, pp.58-59, 81-82, Ex. G, pp.20-21.[5]  She also took sworn statements from the plaintiffs, who maintained that the intercourse was consensual.  Id., Ex. U-4, Ex. U-5, Ex. G, p.15.

Sgt. Stanton was aware that a friend of Miller's was present during the alleged events, but did not learn that it was Redeye until after plaintiffs' arrest.  Ehman Affidavit [16], Ex. K, pp.91-92.  She did not know any of the witnesses, plaintiffs or Miller, but knew that Redeye was the daughter of a former confidential informant she had used in the past.  Id., pp.33-34.

According to Redeye's sworn statement dated December 11, 2008, after Gogel came downstairs and told her that he had sexual intercourse with Miller and that Kinder was with her, Miller's "phone went off for her birth control and after a couple times, about 20-25 mins. after [Kinder] came down.  I brought [Miller] her purse + phone and told her to take her pill.  She refused and told me to just not worry about it.  That's when I went downstairs.  Ashley showed

---

[5]        In support of their motion for summary judgment, defendants rely on the expert affidavit of Robert Osiewicz, Ph.D., DABFT, opining that Miller was "highly intoxicated in the late evening hours of December 9, 2008, at the time of the reported sexual intercourse, and therefore was unable to think clearly and make thoughtful and prudent decisions."  Ehman Affidavit [16], Ex. V, ¶14.

up asking for [Miller] and when I went to get her, she said she didn't want to.  I took Ashley

upstairs and she took [Miller] away."  Id., U-8, p.2.   In contrast to the date that appears on  the

statement and Sgt. Stanton's testimony that Redeye provided  the statement on December 11,

2008 (id., Ex. K, p.109),  Redeye testified that she believed that she provided her statement on

the morning of  December 10, 2008, and that she did not date her statement December 11, 2008.

Elbadawi Affidavit [26-1], Ex. 2, pp.33-34.


### The Prosecution

Plaintiffs were arrested on December 10, 2008 and charged in a criminal

complaint signed by Sgt.  Stanton with rape in the first degree, in violation of NY Penal Law

§130.35(2), and with assault in the third degree, in violation of NY Penal Law §120.00(1).

Ehman Affidavit [16], Exs. U-1, U-2.  Sgt. Stanton was uncertain whether she read the Incident

Report (id., ex. U-3) before filing the felony complaint, and she did not receive Miller's medical

records until after she filed the complaint.  Id., Ex. K, pp.68, 71, 106.

Sgt. Stanton also filed the felony complaint before speaking with Moritz or Frary.

Id., Ex. K, pp.85, 93.  She claims that she did so because she was informed by the Cattaraugus

County District Attorney and Chief Tory Westfall to move forward with the charges.  Id., Ex. K,

pp.85-87, 92-93.  However, according to Chief Westfall, he never instructed Sgt. Stanton to file

the charges.  Elbadawi Affidavit [26-1], Ex. 7, p.16.  In fact, there was never an instance where

he instructed Sgt. Stanton to file a felony complaint, because he wanted "to have the district

attorney's input in it, if at all possible."  Id., Ex. 7, p.18.  After the arrests were made, he spoke to

Sgt. Stanton, who advised him that Assistant District Attorney  ("ADA") Lori Rieman advised

her to "'move forward with the charges'".  Id., Ex. 7,  p.17.  Chief Westfall later spoke to ADA

Rieman, who "assured [him] that it would be going to the grand jury." Id.

Sometime after plaintiffs' arrest, but before the February 9, 2009 grand jury

proceeding, Lieutenant Schultz approached Chief Westfall and voiced concern that "there should

have been more investigation done." Id., Ex. 7, pp.23-24; Ehman Affidavit [16], Ex. N, p.25

(Lieutenant Schultz told Chief Westfall that he "thought it was a bullshit case").  This prompted

Chief Westfall to review the case file and to speak to ADA Rieman, who advised him that the

"'[t]he case is good to go'", and confirmed that Sgt. Stanton had spoken to her before making the

arrests.  Elbadawi Affidavit  [26-1], Ex. 7, pp.26-27, 29-30. When Chief Westfall advised Sgt.

Stanton of Lieutenant Schultz's misgivings, "[s]he got upset and left." Id., Ex. 7,  p.29.

When ADA Rieman was asked about whether she advised Sgt. Stanton to file the

charges, she testified that "Mr. Sharkey may have told her that.  I don't know.  I wouldn't have

said file the charges.  I would have said, yes, I think you have sufficient evidence for a    rape . . .

and if she had asked me on this case, I would have said there's enough."  Ehman Affidavit [16],

Ex. R,  pp.35-36.[6]


**The Preliminary Hearing**

A preliminary hearing was conducted in Salamanca City Court before Hon.

William Gabler on December 12, 2008.  Ehman Affidavit [16], Ex. G.  At the preliminary

hearing  plaintiffs' counsel cross-examined Sgt. Stanton and Miller.  Id.  When asked whether

Redeye had indicated to her "in any way that [Miller] was incapacitated", Sgt. Stanton testified

---

[6]     Edward Sharkey was the Cattaraugus County District Attorney at the time.

that Redeye was "unsure". Id., Ex. G, p.12.  When later deposed about this aspect of her

testimony, Sgt. Stanton testified that she did not recall Redeye stating that she was unsure

whether Miller was incapacitated. Id., Ex. K, p.129.  Although ADA William Marshall, the

prosecutor that handled the preliminary hearing, testified that did not recall whether he was

aware of Redeye's statement (id., ex. Q, p.17), Sgt. Stanton testified that after she received

Redeye's statement, she provided it to the District Attorney's Office and noted on the incident

report that it "was given to the court and a copy was placed in the case file" on December 11,

2008. Id., Ex. K, p.113, Ex. U-3, p.3.  According to Chief Westfall, the District Attorney would

have taken everything from the court file and there is no way to change a date entry on the

incident report.  Elbadawi Affidavit [26-1], Ex. 7, pp.49-50.

At the conclusion of the hearing, Judge Gabler concluded "that there's reasonable

cause to believe that Miss Miller was helpless at the time of the sexual activity" and held the

plaintiffs over for action by the grand jury. Id., Ex. G, p.58.


### The First Grand Jury

On February 5, 2009 a grand jury was convened.  The prosecutor assigned to the

case was ADA Rieman.  Ehman Affidavit [16], Ex. R, p.88.  Before presenting the case, she

received the Police Department's file and she and her investigator met with Redeye. Id., Ex. R,

pp.21-22.  Although Redeye was subpoenaed to testify before the grand jury, ADA Riedman

elected not to have her testify because "after finding out  more information [she] didn't feel that

she was a truthful witness. . . .  [S]he lied about where they got the beer. . . . [A]t the time [she

was] a highly unstable child, young lady." Id.,Ex. R,  p.17.

Among the witnesses before the grand jury was Denise Fish, R.N.,[7] the sexual assault nurse who examined Miller. Id., Ex. H, p.20.  Nurse Fish testified that when Miller arrived at the hospital she was incontinent and unresponsive. Id., Ex. H, p.23.  Nurse Fish had to wait to examine her because she was unconscious. Id., Ex. H, p.22. Miller's blood alcohol level was measured at .239, which Nurse Fish testified could make a six foot tall 230 pound male intoxicated, and "[f]or someone who is a smaller size, it could make them unconscious." Id., Ex. H, pp.22, 25.  Once she was able to examine Miller, she observed injuries to the vagina consistent with non-consensual sexual intercourse and recorded other injuries. Id., Ex. H, pp.23-25.

Sgt. Stanton also testified before the grand jury.  She testified that while it remained an open investigation, she believed that the beer was purchased by Redeye's cousin. Id., Ex. H, pp.54-55. When she was asked by a grand juror whether Redeye had "anything to contribute that was helpful?", she responded,  "Not at all.  Her story was completely conflicting and was so conflicting even with the suspects' stories.  So her credibility was pretty much zero." Id., Ex. H, p.55.


**Dismissal of the Indictment**

By Decision dated June 1, 2009, Cattaraugus County Judge Larry M. Himelein dismissed the indictment, without prejudice.  Id., Ex. T.  In relevant part, Judge Himelein concluded that:

---

[7]         Nurse Fish is now known as Denise O'Neil.  Ehman Affidavit [16], Ex. S.

> "[t]he investigator's answer to the grand juror's question was untrue.
> In fact, the woman's statement to the police corroborated the defendants'
> statements that the incident was consensual.  Further, it is inappropriate
> for one witness to denigrate another; that function is for the fact finder.
> The assistant district attorney's failure to correct the testimony allowed
> the grand jury to consider false testimony that could and should have
> been corrected.  The defendants were clearly prejudiced and the indictment
> must be dismissed for that reason alone." Id., Ex. T, p.4.

When later deposed about this aspect of her testimony, Sgt. Stanton testified that she found Redeye's story to be conflicting "[b]ecause [Redeye] was very unresponsive to me. She did not want to tell me that her cousin bought that beer. She was lying to me during the interview." Id., Ex. K,  p.160.  Sgt. Stanton was not reprimanded by Chief Westfall as a result of this decision.  Elbadawi Affidavit [26-1], Ex. 7, pp.39-40.

### The Second Grand Jury

The second grand jury declined to indict plaintiffs.  Ehamn Affidavit [16], Ex. J; Complaint [1-2], ¶14; Defendants' Memorandum of Law [17], p.6. The grand jury presentation was made by a different assistant district attorney, and included testimony from Moritz and Redeye, who had not testified before the first grand jury. Ehman Affidavit [16], Ex. J.

### Plaintiffs' Complaint

Plaintiffs' Complaint [1-2] alleges causes of action for malicious prosecution and false imprisonment under state and federal law (first and third causes of action), for violation of plaintiffs' rights under the Fourteenth Amendment (id., second cause of action), for negligent supervision (id., fourth cause of action), and for gross negligence and negligent infliction of

emotional distress (id., sixth cause of action).  In addition to these causes of action, plaintiffs

allege that defendants City of Salamanca and City of Salamanca Police Department (collectively

the "municipal defendants") are responsible for the acts of defendant Sgt. Stanton under the

doctrine of *respondeat superior* (id., fifth cause of action).


## ANALYSIS

### A.      Plaintiffs' Cross-Motion for Leave to Amend

Plaintiffs cross-move for leave to amend the Complaint to assert two additional

causes of action for "42 U.S.C. 1983 Civil Action for Deprivation of Rights" against Sgt. Stanton

(Proposed Amended Complaint [26-14], seventh cause of action) and against the municipal

defendants (id., eighth cause of action) on the grounds that "[t]he municipal Defendants' failure

to remedy, correct or investigate Stanton's actions . . . amounted to actionable deliberate

indifference" and that "[t]he customs, policies, practices and procedures adopted . . . by the

municipal Defendants resulted in the deprivation of Plaintiffs' rights . . . under the Constitution"

(id., ¶¶60, 62).  In conjunction with these proposed claims, plaintiffs seek to recover attorney's

fees (id., "wherefore" clause).

Defendants oppose the motion, arguing that plaintiffs have unduly delayed in

seeking to amend the Complaint and have failed to satisfy the "good cause" standard of Fed. R.

Civ. P. ("Rule") 16.  Defendants' Memorandum of Law [29], p.1.  However, notwithstanding the

Complaint's failure to specifically mention §1983, in moving for summary judgment (*prior* to

plaintiffs' cross-motion to amend), defendants addressed the issue as though it had been pled.

*See*, *e.g.*, defendants' Memorandum of Law [17], p. 17 ("Although municipalities are considered

'persons' for purposes of 42 U.S.C. §1983, a local government may not be held liable under §1983 unless the challenged action was performed pursuant to a municipal custom or policy").[8]

Rule 15(b)(2) states that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings".  The Rule also applies to summary judgment motions. Cruz v. Coach Stores, Inc., 202 F3d 560, 569 (2d Cir. 2000); Kulkarni v. Alexander, 662 F.2d 758, 762 (D.C.Cir. 1978). Therefore, the Complaint will be deemed to have alleged a cause of action under §1983, and I will proceed to consider plaintiffs' claim on their merits.

**B.      Defendants' Motion for Summary Judgment**

In support of their motion for summary judgment, defendants argue that the Salamanca police department is not a separate entity subject to suit (defendants' Memorandum of Law [17], pp.9-10), that there was probable cause for plaintiffs' arrest, thereby barring all false arrest and malicious prosecution claims (id., pp.10-13), that none of the defendants had control over the grand jury proceedings (id., pp.13-15), that Sgt. Stanton is entitled to absolute immunity for her grand jury testimony (id., pp.15-17), that there is no evidence of a municipal custom or policy to subject the City to liability (id., pp.17-19), and that Sgt. Stanton and the police department are entitled to qualified immunity (id., pp.19-21).

---

[8]      In fact, had defendants not believed that plaintiffs were proceeding under §1983, they could not have removed the action to this court on the basis of a "federal question" [1], since "Congress has provided §1983 as the sole remedy for federal constitutional violations by state officials".  Murphy v. Zoning Commission of Town of New Milford, 223 F.Supp.2d 377, 381 (D.Conn. 2002)

1.    **Summary Judgment Standard**

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]  Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party.' " Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

While the moving party must demonstrate the absence of any genuine factual dispute, the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is *a genuine issue for trial*." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original).  "An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (emphasis in original).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

2.      **Uncontested Arguments**

Since plaintiffs fail to contest that the Salamanca police department is not a

separate entity subject to suit (defendants' Memorandum of Law [17], pp.9-10),  I recommend

granting this aspect of defendants' motion.  *See* Pierce v. Chautauqua County, 2007 WL

2902954, *3 (W.D.N.Y.2007) (Curtin, J.) ("It is well settled that, under New York law,

departments which are merely administrative arms of a municipality, do not have a legal identity

separate and apart from the municipality and cannot sue or be sued."); Latona v. Chautauqua

County Jail, 2004 WL 2457797, *3 (W.D.N.Y. 2004) (Scott, M.J.) ("In New York, departments

like the [Chautauqua County Jail], which are merely administrative arms of a municipal

corporation, do not have a legal identity separate and apart from the municipality and cannot be

sued").

Plaintiffs likewise fail to contest defendants' argument that punitive damages are

not recoverable against the municipal defendants.  Defendants' Memorandum of Law [17], p.22.

Therefore, I recommend granting this aspect of defendants' motion.  *See* New Windsor Volunteer

Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 122 (2d Cir. 2006) ("a municipality itself is

immune from a claim for punitive damages").


3.      **Absolute Immunity**

Relying on Briscoe v. LaHue, 460 U.S. 325 (1983), defendants argue that Sgt.

Stanton is entitled to absolute immunity for her grand jury testimony.  Defendants' Memorandum

of Law [17], pp. 15-16.  I disagree. In Briscoe, the Supreme Court extended absolute immunity to

police officers testifying at trial.  However, the Supreme Court's subsequent decision in <u>Malley v. Briggs</u>, 475 U.S. 335 (1986), appears to have carved out an exception for "complaining witnesses" to the absolute immunity rule of <u>Briscoe</u>.

Relying on <u>Malley</u>, the Second Circuit has held that absolute immunity has been afforded "to officials charged under section 1983 with testifying falsely at various types of pretrial proceedings, although the decisions have not been careful to recognize that such immunity is available *only where the constitutional tort is simply giving false testimony. . . .* Where, however, the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a 'complaining witness' renders him liable to the victim under section 1983".  <u>White v. Frank</u>, 855 F.2d 956, 961 (2d Cir. 1988) (emphasis added).  A complaining witness is defined as "those who played a role in initiating a prosecution" (<u>id.</u>, 959).  "Whether a witness is a complaining witness is a fact-based question that coincides with the determination of whether the witness played such a role in initiating the proceedings that it can be said the witness commenced or continued proceedings against the plaintiff within the meaning of the law of malicious prosecution." <u>Mejia v. City of New York</u>, 119 F.Supp.2d 232, 272 (E.D.N.Y. 2000).

The complaining witness "exclusion extends to grand jury testimony of an officer who participates in initiating a baseless prosecution".  <u>Sclafani v. Spitzer</u>, 734 F.Supp.2d 288, 296 (E.D.N.Y. 2010).  Thus, "[a] witness, such as [a] Detective . . . , who files a charging affidavit is clearly a complaining witness".  <u>Mejia</u>, 119 F.Supp.2d at 272. *See* <u>Malley</u>, 475 U.S. at 341-345 (absolute immunity not available to an officer applying for an arrest warrant); <u>Wilson v. Emond</u>, 2009 WL 1491511, *3 (D.Conn. 2009), <u>aff'd</u>, 373 Fed.Appx. 98 (2d Cir.)(Summary

Order), cert. denied, 130 S.Ct. 3516 (2010) ("The quintessential example of a complaining

witness is a police officer who gives false testimony before a grand jury").

Since Sgt. Stanton was clearly a complaining witness by instituting the criminal

charges against plaintiffs, I conclude that she is not entitled to absolute immunity for her grand

jury testimony.

### 4.    False Arrest[9]

Plaintiffs argue that defendants are not entitled to summary judgment on their

false arrest claims because Sgt. Stanton lacked probable cause to arrest them. In support of this

argument they rely on the conclusions of the responding officers, Sgt. Stanton's failure to contact

Moritz or Frary, Redeye's exculpatory statement, and the conflicting evidence as to Miller's

intoxication. Plaintiffs' Memorandum of Law [26-16], pp.3-9.

"Claims for false arrest or malicious prosecution, brought under §1983 to

vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are

substantially the same as claims for false arrest or malicious prosecution under state law."

Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "In order to maintain [their] claim of false

arrest . . . under Section 1983, plaintiff[s] must show that [defendant] violated [their]

Constitutional or federal statutory rights—here, [their] Fourth Amendment right to be free from

unreasonable seizures— and that [defendant] did so while acting under color of state law."

---

[9]    Although the complaint alleges false imprisonment, "[t]he elements of a claim
for false imprisonment made pursuant to Section 1983 are the same as those for false arrest."
Copeland v. New York City Police Department, 1998 WL 799169, *2 (S.D.N.Y. 1998).

Gignac v. Ontario County, 2012 WL 113348, *5 (W.D.N.Y. 2012) (Larimer, J.).  "The existence

of probable cause to arrest constitutes justification and is a complete defense to an action for

false arrest, whether that action is brought under New York law or under §1983."  Kilburn v.

Village of Saranac Lake, 413 Fed.Appx. 362, 363 (2d Cir. 2011) (Summary Order).

      Sgt. Stanton's criminal complaint charged plaintiffs with rape in the first degree

and with assault in the third degree.  Ehman Affidavit [16], Exs. U-1, U-2. "A person is guilty of

rape in the first degree when he or she engages in sexual intercourse with another  person . . .

[w]ho is incapable of consent by reason of being physically helpless".  NY Penal Law

§130.35(2).[10] "A person is guilty of assault in the third degree when. . . [w]ith intent to cause

physical injury to another person, he causes such injury to such person or to a third person".  Id.,

§120.00(1).

      "[A] police officer may arrest a person for . . . [a] crime when he or she has

reasonable cause to believe that such person has committed such crime, whether in his or her

presence or otherwise." NY Crim. P. Law §140.10(1)(b).  "Reasonable cause is defined

substantially the same as probable cause under the Fourth Amendment."  Hahn v. County of

Otsego, 820 F.Supp. 54, 58 (N.D.N.Y. 1993), aff'd, 52 F.3d 310 (2d Cir. 1995)(citing  Raysor v.

Port Authority of New York & New Jersey, 768 F.2d 34, 39–40 (2d Cir.1985), cert. denied, 475

U.S. 1027 (1986)).

      "When determining whether probable cause exists courts must consider those

facts available to the officer at the time of the arrest and immediately before it".  Panetta v.

---

    [10]    "'Physically helpless' means that a person is unconscious or for any other reason is
physically unable to communicate unwillingness to an act." NY Penal Law §130.00(7).

Crowley, 460 F.3d 388, 395 (2d Cir. 2006)(emphasis omitted). "[T]he probable cause inquiry is

objective rather than subjective." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006). The "court

must look to the 'totality of the circumstances' in deciding whether probable cause exists to

effect an arrest." Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002)(quoting Illinois v.

Gates, 462 U.S. 213, 233 (1983)).

 "[P]robable cause to arrest exists when the known facts are 'sufficient to warrant

a person of reasonable caution in the belief that the person to be arrested has committed or is

committing a crime.'" Donovan, 250 F.Supp.2d at 253 (quoting Jocks, 316 F.3d at 135).

"Probable cause may exist based on false or mistaken information, so long as the police . . . acted

reasonably and in good faith." Rateau v. City of New York, 2009 WL 3148765, *8 (E.D.N.Y.

2009).

 "[T]he standard for establishing probable cause is not a particularly stringent

one." Donovan v. Briggs, 250 F.Supp.2d 242, 253 (W.D.N.Y. 2003) (Larimer, J.).  It "does not

require absolute certainty". Panetta, 460 F.3d at 395.  However, "[t]he quantum of evidence

required to establish probable cause to arrest need not reach the level of evidence necessary to

support a conviction. . . but it must constitute more than rumor, suspicion, or even a  'strong

reason to suspect'" United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983)(quoting Wong

Sun v. United States, 371 U.S. 471, 479 (1963)).

 "The question of whether or not probable cause existed may be determinable as a

matter of law if there is no dispute as to the pertinent events and the knowledge of the officers".

Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  However, here, there are triable issues of fact

as to whether Sgt. Stanton was aware of exculpatory evidence at the time she arrested the

plaintiffs.  *See* Anderson v. City of New York, 817 F.Supp.2d 77, 88 (E.D.N.Y. 2011), recon.

denied, 2011 WL 5175600 (E.D.N.Y. 2011)("the court cannot determine whether probable cause

existed as a matter of law because genuine issues of material fact exist as to the relevant events").

   Most significantly, there is a factual dispute as to whether Sgt. Stanton took

Redeye's exculpatory statement before she arrested plaintiffs.  There also exists factual issues as

to what Sgt. Stanton learned from Lieutenant Schultz before the arrests.[11]  This is also significant

because Lieutenant Schultz had compiled a litany of exculpatory information on the night of the

incident, which he memorialized in the Incident Report, including the fact that  Miller answered

all of his pedigree questions while in the back of the ambulance, and when he asked her whether

she had casual sex with plaintiff Gogel, she responded, "I probably did".  Ehman Affidavit [16],

Ex. U-3, p.3.  Lieutenant Schultz also recorded in the Incident Report that Ashley Weir "talked to

her sister and she stated that she had consented to having sex." Id., Ex. U-3, p.3.  Therefore, I am

unable to determine as a matter of law whether probable cause existed for plaintiffs arrests.

   I recognize that "[e]ven where factual disputes exist, a §1983 claim may fail if the

plaintiff's version of events is sufficient to establish probable cause to arrest."  McZorn v.

Endicott Police Department, 2008 WL 163581, *7 (N.D.N.Y. 2008). However, if Sgt. Stanton

knew of Redeye's and Lieutenant Schultz's observations, which cast significant doubt on

---

[11] Sgt.  Stanton's testimony about what she learned from Lieutenant Schultz is internally inconsistent.  At points she testified that he never told her of this exculpatory information (Ehman Affidavit [16], Ex. K, pp. 76, 78, 80-81), whereas at others she testified  that she did not remember the conversation (id., pp. 76, 80), and at others she testified that he did tell her that Miller said "I probably did" (id., p. 80).  Sgt.  Stanton also could not recall when she read the Incident Report  Id., p. 71.

Miller's level of intoxication and claim of a non-consensual encounter, I conclude that there would be a triable issue of fact as to whether probable cause existed for the arrests.

"An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest *absent circumstances that raise doubts as to the victim's veracity*." Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995), cert. denied, 517 U.S. 1189 (1996) (emphasis added). Moreover, "an officer may not disregard plainly exculpatory evidence." Panetta, 460 F.3d at 395.

While Sgt. Stanton knew from Officer Frentz that medical evidence existed supporting Miller's claim, in determining whether the facts known to an officer give rise to probable cause, I must not "consider individual facts in isolation but [must] examine the totality of the circumstances." United States v. Delossantos, 536 F.3d 155, 161 (2d Cir.), cert. denied, 555 U.S. 1056 (2008) (*citing* Maryland v. Pringle, 540 U.S. 366, 371 (2003)). Bearing in mind that "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment" United States v. Rem, 38 F.3d 634, 644 (2d Cir.1994), and giving plaintiffs every favorable inference as the non-movants, I am unable to conclude as a matter of law, when viewing the totality of the circumstances, that probable cause existed to arrest plaintiffs. *See* Wu v. City of New York, 934 F.Supp. 581, 588 (S.D.N.Y. 1996) (denying summary judgment on false arrest claim where police credited the victim's assault allegation over conflicting stories of the alleged assailant and an eye witness).[12] I

---

[12]    *Compare with* Donovan, 250 F.Supp.2d at 246, 252-53 (circumstances calling the victim's credibility into question, including a "to-do list" stating "Frame dad for Abuse (sexual or physical?)" was "not enough to dispel probable cause").

acknowledge that this is a close call, but it is one that I believe must be decided by the trier of fact.

I also reject defendants' argument that Judge Gabler's probable cause decision collaterally  precludes plaintiffs' false arrest claims. Defendants' Memorandum of Law [17], p. 11. "Once a local criminal court, after holding a preliminary hearing on a felony complaint, determines that the action should be held over for a grand jury, probable cause is presumed. . . . This presumption may be overcome only by evidence of bad faith such as fraud, perjury, or falsification, misrepresentation, or withholding of evidence." Fincher v. County of Westchester, 979 F.Supp. 989, 1000 (S.D.N.Y. 1997);  Gisondi v. Town of Harrison, 72 N.Y.2d 280, 283-284 (1988).[13]  At minimum, there exists a triable issue of fact as to whether Sgt. Stanton provided materially false testimony at the preliminary hearing by testifying that she was "unsure" whether Redeye had indicated to her "in any way that [Miller] was incapacitated".  Ehman Affidavit [16], Ex. G, p.12.  When later deposed about this aspect of her testimony, Sgt. Stanton conceded that she did not recall Redeye stating that she was unsure whether Miller was incapacitated.  Id., Ex. K, p.129.

I likewise conclude that Sgt. Stanton is not entitled to qualified immunity as a matter of law.  Qualified immunity is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Jenkins v. City of New York, 478 F.3d 76, 87 n.9 (2d Cir. 2007)(quoting Mitchell v.

---

[13]      "This presumption of probable cause from the grand jury's indictment applies to malicious prosecution claims but not to false arrest claims."  Hill v. Melvin, 2006 WL 1749520, *13 n.25 (S.D.N.Y. 2006), aff'd, 323 Fed. Appx. 61 (2d Cir. 2009)(Summary Order).

Forsyth, 472 U.S. 511, 526 (1985)).  "Under federal law, a police officer is entitled to qualified

immunity where (1) his conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for

him to believe that his actions were lawful at the time of the challenged act." Jenkins v. City of

New York, 478 F.3d 76, 87 (2d Cir. 2007).  It "shields  all but the plainly incompetent or those

who knowingly violate the law.'" Pinter v. City of New York, 2011 WL 5604689, *3 (2d Cir.

2011) (summary order)(*quoting* Malley v. Briggs, 475 U.S. 335, 341 (1986)).

        If the trier of fact were to credit Redeye's testimony that her statement was taken

on the morning of December 10, 2008, thereby creating the inference that Sgt. Stanton post-dated

the statement to make it appear that it was given after the criminal complaint was filed, Sgt.

Stanton would not have any objectively reasonable basis to believe that her actions were lawful.

Therefore, I conclude that Sgt. Stanton is not entitled to qualified immunity as a matter of law,

and  recommend that this aspect of defendants' motion be denied.


      **5.**    **Malicious Prosecution**

        Plaintiffs oppose dismissal of this claim, arguing that Sgt. Stanton acted with

malice by initiating the criminal proceedings against them without probable cause, and that any

presumption of probable cause created by the indictment was the result of Sgt. Stanton's false

testimony.  Plaintiffs' Memorandum of Law [26-16], pp.10-18. I agree with plaintiffs.

        "The elements of malicious prosecution under New York law are (1) that the

defendant commenced a criminal proceeding against the plaintiff; (2) that the proceeding was

terminated in the plaintiff's favor; (3) that there was no probable cause for the initiation or

continuation of the proceeding; and (4) that the defendant acted with malice." Ramos v. City of New York, 298 Fed.Appx. 84, 85, 2008 WL 4810545, *1 (2d Cir. 2008)(Summary Order). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).

There is no dispute that the prosecution ended in plaintiffs' favor when the second grand jury declined to indict them (see Birthwright v. City of New York, 2005 WL 2179072, *8 (S.D.N.Y. 2005) (the refusal of a grand jury to indict constitutes a favorable termination for purposes of a malicious prosecution claim)) and that Inspector Stanton initiated the prosecution by filing the criminal complaint. See Burt v. Aleman, 2008 WL 1927371, *5 (E.D.N.Y. 2008) ("A police officer who swears to and signs a criminal court complaint, . . . has 'initiated' a prosecution"). Thus, my inquiry turns on the remaining factors.


a.        **Probable Cause for the Initiation or Continuation of the Prosecution**

"Determination of probable cause for malicious prosecution is essentially the same as for false arrest, except that it must be evaluated in light of facts known or believed at the time the prosecution is initiated, rather than at the time of arrest." Lovelace v. City of New York, 2005 WL 552387, *2 (E.D.N.Y. 2005). "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" Rounseville v. Zahl, 13 F.3d 625, 629-630 (2d Cir. 1994) (quoting Pandolfo v. U.A. Cable Systems of Watertown, 171 A.D.2d 1013, 1013 (4th Dep't 1991)). Since plaintiffs were arrested at the same time the prosecution was commenced again

them by criminal complaint, I conclude, for the reasons discussed above, that a triable issue of fact exists as to whether Sgt. Stanton had probable cause to initiate the prosecution.

Even if the Cattaraugus County District Attorney's Office had control of the later grand jury proceeding, as defendants argue (defendants' Memorandum of Law [17], pp. 13-14), that does not preclude a malicious prosecution claim against Sgt. Stanton for her conduct before the grand jury. "[T]he public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false." White, 855 F.2d at 962. For example, "[a] defendant may be said to . . . continue a prosecution if that defendant knowingly provides false information or fabricated evidence that is likely to influence the prosecutors or the grand jury." Watson v. Grady, 2010 WL 3835047, *5 (S.D.N.Y. 2010). See Sutton v. Duguid, 2007 WL 1456222, *8, 10 (E.D.N.Y. 2007)( a triable issue of fact barred dismissal of a malicious prosecution claim arising from a charge of resisting arrest based upon allegedly false grand jury testimony by defendant police officer ). [14]

"Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome." Manganiello v. City of New York, 612 F.3d 149, 162 (2d Cir. 2010). Since Judge Himelein

---

[14]     *Compare with* Burt, 2008 WL 1927371 at *5 ("Once control of a prosecution has passed to a prosecuting attorney, a police officer may *only* be liable for continuing the prosecution if he or she insists upon or urges further prosecution" (emphasis added)).

dismissed the indictment based upon Sgt. Stanton's "untrue" testimony, which "clearly prejudiced and the indictment" (Ehman Affidavit [16], Ex. T, p.4), I conclude that defendants are not entitled to the presumption of probable cause created by the return of the first indictment.

### b.      Malice

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 502–03 (1978)). "In most cases, the lack of probable cause - while not dispositive - 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause'". Id. (quoting Conkey v. State, 74 A.D.2d 998, 999 (4th Dep't 1980)).

Since triable issues of fact exist as to whether Sgt.  Stanton lacked probable cause for initiating the prosecution and whether she provided false testimony at the preliminary hearing and  grand jury, which may have continued the prosecution,  I likewise conclude that a triable issue of fact exists as to whether Sgt. Stanton acted with malice.  See Sutton, 2007 WL 1456222 at *10 ("the resolution of the disputed issue over whether defendants lacked probable cause, and whether Detective Duguid lied to the grand jury, could provide a basis for a reasonable jury to infer that Detective Duguid acted with malice").

As discussed above, since there are factual issues as to whether Sgt. Stanton post-dated Redeye's statement and provided false testimony at the preliminary hearing and to the

grand jury,  I am unable to dismiss plaintiffs' malicious prosecution claims on qualified

immunity grounds.  *See* id. at *11 ("if plaintiff proves that Detective Duguid knowingly gave

false testimony to the grand jury to secure the indictment, qualified immunity would not be

available").

There is also a triable issue of fact as to whether Sgt. Stanton ever obtained

approval to commence the prosecution against plaintiffs.  Whereas she testified that she was

informed by the Cattaraugus County District Attorney and Chief Tory Westfall to move forward

with the charges (Ehman Affidavit [16], Ex. K,  pp.85-87, 92-93), Chief Westfall testified that

he never instructed Sgt. Stanton to file the charges.  Elbadawi Affidavit [26-1], Ex. 7, p.16.

Therefore, I recommend that this aspect of defendants' motion be denied.


6.      **Section 1983 Claim Against the Municipal Defendants**

Unlike the Section 1983 claim against Sgt. Stanton, "[a] municipality cannot be

held liable under §1983 on a *respondeat superior* theory . . . .  Instead, it is when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury that the government as an entity

is responsible under §1983."  Monell v. Department of Social Services of the City of New York,

436 U.S. 658, 691, 694 (1978).  "Because respondeat superior liability is not permissible . . . the

courts must apply rigorous standards of culpability and causation . . . to ensure that the

indirect-causation theory not result in the municipality's being held liable solely for the actions

of its employee." Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000), cert. denied, 531 U.S. 813

(2000). "A municipal policy may be pronounced or tacit and reflected in either action or

-26-

inaction. . . .   Consistent with this principle, 'where a policymaking official exhibits deliberate

indifference to constitutional deprivations caused by subordinates, such that the official's

inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city

policy or custom that is actionable under §1983.'" Cash v. County of Erie, 654 F.3d 324, 334 (2d

Cir. 2011), cert. denied, __S.Ct.__, 2012 WL 895977 (2012).

        In order for a  municipality to be liable under §1983 for inadequate supervision of

its subordinates, a "plaintiff must show that a responsible municipal policymaker had

contemporaneous knowledge of the offending occurrence *or* knowledge of a pattern of prior

incidents of similar violations of constitutional rights and failed to take adequate measures to

ensure the particular right in question or otherwise communicated a message of approval to the

offending subordinates." Garcia v. County of Bucks, PA, 155 F.Supp.2d 259, 268 (E.D.Pa.

2001)(emphasis added).   "The operative inquiry is whether th[e] facts demonstrate that the

policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' . . . Thus,

deliberate indifference may be inferred where 'the need for more or better supervision to protect

against constitutional violations was obvious,' . . . but the policymaker 'fail[ed] to make

meaningful efforts to address the risk of harm to plaintiffs'".   Cash, 654 F.3d at 334.

        In response to defendants' motion for summary judgment, plaintiffs argue that

"[a]lthough Chief Westfall received information from Officer Schultz suggesting Stanton's

actions were questionable and although Chief Westfall also concluded that Stanton's actions

were questionable, no remedial, corrective or interventional measures were taken and no internal

investigation was initiated" contrary to the Salamanca  Police Department's policy.  Plaintiffs'

Memorandum of Law [26-16], p. 26.  This characterization of Chief Westfall's actions ignores

that in response to Lieutenant Schultz's concerns, he reviewed the case file and spoke to ADA

Rieman, who advised him that the "'[t]he case is good to go'", and confirmed that Sgt. Stanton

had spoken to her before making the arrests.  Elbadawi Affidavit  [26-1], Ex. 7, pp.25-27, 29-30.

While Chief Westfall may not have followed the City of Salamanca Police

Department's policy in recording his investigation into the concerns raised by Lieutenant

Schultz[15], this may be considered negligent.  However, recognizing that deliberate indifference is

a "'stringent standard of fault'" , Cash, 654 F.3d at 334 (quoting Connick v. Thompson, 131

S.Ct. 1350, 1360 (2011)), it cannot be concluded that his "response was so patently inadequate to

the task as to amount to deliberate indifference".  Reynolds v. Giuliani, 506 F.3d 183, 193 (2d

Cir. 2007).  See Sarus v. Rotundo, 831 F.2d 397, 401 (2d Cir. 1987) (conduct must be "so severe

as to constitute 'gross negligence' or 'deliberate indifference' to a plaintiff's rights").

Even with his knowledge of Lieutenant Schultz's concerns about the criminal

complaint, there is nothing in the record to suggest that Chief Westfall could have suspected that

Sgt. Stanton would testify falsely before the grand jury. Instead, plaintiffs argue that "despite

learning about Judge Himelein's decision . . . Chief Westfall did not reprimand or discipline

Stanton and he did not take any remedial, corrective or investigative action."  Plaintiffs'

Memorandum of Law [26-16], p. 26.  However, to establish Monell liability, "[p]laintiffs must

prove in the end that the state defendants' inadequate supervision actually caused or was the

moving force behind the alleged violations."  Reynolds v. Giuliani,  506 F.3d 183, 193 (2d Cir.

---

[15]     The Salamanca Police Department's Administrative Order 290 entitled  Disciplinary
Procedures ([26-10]), states that "[a] supervisor receiving information, or having knowledge, concerning
misconduct of a member, shall promptly being an investigation of the matter. The supervisor shall reduce
to writing, in affidavit form, any statement of complaints, exactly as stated".

2007).  *See* <u>Garcia</u>, 155 F.Supp.2d at 268 ("Any failure to . . . supervise adequately, of course,

must . . .  cause the violation about which the plaintiff complains").

   Chief Westfall's failure to discipline Sgt. Stanton for her false testimony to the

first grand jury could not be the driving force behind Sgt. Stanton's alleged false arrest and

malicious prosecution as these violations would have already occurred.  While Chief Westfall's

failure to take any action in response to Sgt. Stanton false testimony before the grand jury may

provide the evidentiary basis sufficient to establish his deliberate indifference to preventing

future incidents, it does not establish deliberate indifference for the conduct that already had

transpired where he had no contemporaneous knowledge of it.


  **7.**  ***Respondeat Superior*, Negligent Supervision and Gross Negligence and Negligent Infliction of Emotional Distress**

   Defendants' motion ignores plaintiffs' remaining claim for negligent supervision

(Complaint [1-2], fourth cause of action), *respondeat superior* liability (<u>id</u>., fifth cause of

action),[16] and for gross negligence and negligent infliction of emotional distress (<u>id</u>., sixth cause

of action). Therefore, I recommend that these state law claims not be dismissed.


---

   [16]  "[U]nder the common law, 'unlike §1983, a municipality may be held liable for common law false arrest and malicious prosecution on a theory of respondeat superior.'" <u>Anderson</u>,  817 F.Supp.2d at  98.

**CONCLUSION**

For these reasons, I order that plaintiffs' motion for leave to amend [26] be granted, and I further recommend that defendants' motion for summary judgment [16] be granted to the extent of dismissing all claims against the Salamanca Police Department, and the §1983 and punitive damages claims against the City of Salamanca, but otherwise denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by April16, 2012 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: March 30, 2012

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge